PERKINS v. SCOTT. { March 21, 1876.

*Constitutionality of auditor law—Waiver.*

The provisions of ch. 212, Gen. Stats., providing for sending cases to auditors, and making the auditor's report evidence to the jury, are not in violation of the constitution.

By CUSHING, C. J. If they were so, the objection should be taken when the order of reference is made, and if not so taken is waived.

FROM GRAFTON CIRCUIT COURT.

ASSUMPSIT. Plea, the general issue with a set-off. The action was referred to an auditor, who heard the parties and made a report in favor of the plaintiff. Upon the return of the report, the defendant moved to set the same aside for the reasons stated in certain affidavits. The court denied the motion, and the defendant excepted. The defendant then elected a trial by jury. Upon the trial, the plaintiff offered the report in evidence, and the defendant objected; but the court admitted it, and the defendant excepted. For the purpose of determining the questions raised by the motion to reject, and the question of the admissibility of the report as evidence, the case was taken from the jury.

All questions of law arising upon the foregoing case, and all questions of the proper exercise of discretion, were transferrred to this court for determination, by STANLEY, J.

*Shirley*, for the defendant.

I. The auditor's report was not admissible as evidence. This question was carefully considered by the supreme court of Rhode Island, in *Francis v. Baker*, decided February 24, 1875. That case was "an action of assumpsit upon book account, and upon divers notes and checks." Under a law like ours, it was referred to an auditor in the common pleas, who reported in favor of the plaintiff for $13,512.46. The case came up to the supreme court by appeal. "At the trial in this court the plaintiff offered to read the report of the auditor as evidence; and the defendant objected to its admission on the ground that the statute under which the case was referred to the auditor was contrary to the constitution of this state, and of the United States, inasmuch as it impaired the right of trial by jury as secured by the constitution of this state, and the constitution of the United States. But the court ruled that the auditor's report was admissible, and permitted it to be read as evidence. To this ruling the defendant reserved an exception. The court also, in its charge to the jury, instructed them that the report was *prima facie* evidence of the plaintiff's claim, and entitled him

to a verdict in the absence of evidence to the contrary of it. And the defendant excepted to this instruction."

The statute is like ours, and has been in force since some time in 1844. "Previous to that time, and previous to the adoption of the constitution, the courts had power to appoint auditors only in actions of account, and in actions on the case between partners." The provision in the constitution of Rhode•Island, in question, is,—" The right of trial by jury shall remain inviolate." The cause was argued before the full bench, on October 10, 1874, upon the same grounds as *Copp* v. *Henniker*, and substantially the same authorities were relied upon. On February 24, 1875, DURFEE, C. J., delivering the unanimous opinion of the court, held the law unconstitutional, upon the grounds set forth in *Plimpton* v. *Somerset*, 33 Vt. 283, and *Copp* v. *Henniker, ante.*

Judge DURFEE, says,—" The act of 1867, and the statute now in force, are very similar to statutes which have long been in force in Massachusetts and New Hampshire—the statute of Massachusetts having existed since 1817, and the statute of New Hampshire since 1822. The reports of these states contain many cases involving the construction of those statutes, but none that we are aware of in regard to their constitutionality. The constitution of Massachusetts, adopted in 1780, and that of New Hampshire, adopted in 1792, both expressly declare the sacredness of the right of trial by jury."

After reciting the stereotyped arguments of the opinions in *Plimpton* v. *Somerset* and *Copp* v. *Henniker*, Judge DURFEE concludes the opinion by saying,—"We think the decision in Vermont, which coincides with our own opinion, is to be followed, rather than the practice under the several acts referred to [in New Hampshire, Massachusetts, and Rhode Island], which is against it. The plaintiff calls our attention to the fact that the case was referred to an auditor by agreement. We do not see how that makes any difference. An agreement to refer a case to an auditor, is not an agreement that his report may be used as evidence in the trial of the case to the jury, if the provision of the statute making it evidence is void. We grant a new trial."

This authority, in the light of *Copp* v. *Henniker*, is decisive. The forms of action in *Francis* v. *Baker* and the present case were the same; the causes of action, the constitutional provisions and statutes in the two states, were in essence the same; and the powers of auditors in Rhode Island, before the existence of the constitution, were just what the opinion in *Copp* v. *Henniker* assumes they were here before the revolution, &c.

II. But several distinctions—real or imaginary—between the auditor law and the referee act have been patented, or at least a *caveat* has been filed and thrown in the way of this defendant, who has a constitutional right to be heard before his case is decided. No inconsiderable amount of labor has been expended to show that, as respects these two laws, the historical is also the constitutional test. This was unnecessary. A glance at the constitutional provisions leaves no room for argument, notwithstanding *Merrill* v. *Sherburne*, 1 N. H. 179.

But we must respectfully, but none the less earnestly, remind the court that history—the river of time—has its ebbs and floods like all other streams; and that any mode of treatment of such a question, which adopts as conclusive the one tenth of history which favors a pet theory, and rejects the nine tenths which make in the opposite direction, will not commend itself to an intelligent profession.

The auditor law covers less space than the referee act, but so far as they both go, they occupy the same ground, and have the same effect. Auditors may be appointed " when an investigation of accounts or an examination of vouchers is necessary in any action," &c. Referees may be appointed in " any cause which may require an extended examination of accounts, books, or vouchers," &c. It needs no argument to show that, if these cases can be constitutionally sent to an auditor, and his report can be made *prima facie* evidence at the jury trial, the same cases can be sent to a referee, and his report can constitutionally be given the same effect before the jury.

1. In all these cases, if either party " neglects or refuses " to try his case before the auditor, his " sacred " right of trial by jury is taken from him by a " nonsuit " or " default," and if he goes to trial, the report makes a case against him. There is not a particle of evidence, historical or otherwise, which has any tendency to show that this was so before 1792. Those who assert it are bound to prove it. The doctrine of *Copp* v. *Henniker* is, that the jury fee, and the provisions in relation to appeals, are penalties imposed upon the exercise of a constitutional right; and that, unless in substance they existed before the adoption of the present constitution, they must be deemed unconstitutional, as impairing the right of trial by jury. With how much greater force does this reasoning apply to the still greater burdens imposed by the sections of the auditor law referred to.

2. But it is said that there were auditors at common law in actions of account. What of it ? They were not the auditors of the statute. They had no such powers, and their reports—if they made reports in writing—had no such effect. They were merely the computing machines of the court. Whenever an issue of law or fact was raised before them, their functions were suspended. They could decide nothing. They could only certify the points to the court, which settled it with or without the intervention of a jury, and then ordered its machine to go on with its computation. There the auditors must follow the decision of the court or jury. The statute assumes to change ends, and make the court or jury follow the decision of the auditor. The statutory auditor is a court invested with full power to decide all questions of law and fact raised before it. The supreme court decided just that, if it decided anything, in *Moulton* v. *Parker & Young*, 35 N. H. 92, where Harry Hibbard argued at great length to the contrary. Nothing is better settled than that auditors in probate appeals are not auditors under the statute. The auditor of the common law and the auditor of the statute have next to nothing in common.

3. Auditors as a fact—for none appear to have acted, save in

probate appeals, prior to 1792—were a myth. They existed only in imagination. From the earliest times the files of the court fairly swarm with references. No trace has been discovered of any auditor acting under oath prior to the act of December 28, 1836; and no blank commissions existed prior to the act of June 23, 1823. No case was sent to an auditor in Merrimack county before 1833, and but very few between that time and 1836. Apparently no written or printed commissions existed till 1835, when the late Chief Justice BELLOWS was auditor in *Pinkerton* v. *Williams.* Cautious as he was, he was not sworn, and the commission shows plainly that such a thing was never contemplated. In Grafton county, from 1771 to 1833, no trace of auditors can be found. At the May term, 1833, Chief Justice RICHARDSON presiding, the case of *Samuel Stevens, Jr.* v. *Benjamin Hall* (6 N. H. 508) went to an auditor, whose commission reads,— " The parties appear, and agree to refer this action to the consideration of Amos N. Brewster, Esq., who is appointed auditor to state the accounts between the parties, the report of whom being made to this court, and judgment being entered thereon, to be final and conclusive between the parties, and execution to issue accordingly. Said Brewster is to appoint the time and place of meeting, and, in case either party shall not attend after being duly notified, said auditor is to proceed *ex parte.*" No trace of auditors can be found, from the revolution to 1823; nor is there any evidence that they ever made a report in writing, as such, from the earliest times, or that their findings ever went to the jury in any form. In Rockingham county, at the September term, 1823, the docket entry is that N. A. Haven was auditor, but he signs his name as commissioner, and his notice to the parties, so signed, is, that he is " to ascertain the facts relative to a claim preferred by the plaintiff against the defendant," &c. A new entry was made in this county at September term, 1771, and the docket says,—" Saml. Cutts, Jno. Hurd, Jno. Sparhock, are appointed to make an audit on the acco's in dispute between the parties, and return the same as soon as may be; Saml. Cutts, Esq., to appoint time and place." There is no trace of any report on file, or evidence that the auditors did anything, or to show that they were not appointed by consent, as in the probate appeal case the same year. The case was tried by the jury at the next term. This was the only case audited from 1771 to 1823. Actions of assumpsit on account, for account annexed, and for balance of account, not unfrequently came before the governor and council. In none of these is there the slightest allusion to auditors, though one was by *James* (surviving partner) v. *Moffat.* In *Moffat* v. *Livius* (1768, 1769) Moffat and Meserve of Boston, and Peter Livius of the court, were partners. Each, having contributed in proper proportions, owned one third of a vessel and cargo. Moffat induced Livius to enter into the arrangement under a promise " to account with him," but instead, sent the vessel on a voyage without the plaintiff's consent, excluded him from all control and management, and practically converted the vessel, cargo, and earnings to his own use. The record is,—" The

court are of opinion that this demand ought to have been prosecuted by an action of account (and not by trespass on the case), when the appellant, the original defendant, might have had an opportunity of giving a proper issue, and exhibiting his account, that so they might have properly laid before auditors, and the account so adjusted that a just and equal judgment might have been had," &c. This and the second case (*Livius* v. *Moffat*—see pp. 184–190) were both before the court at the same time. The court tried hard to induce the adverse party to consent that an accounting might be had, but he refused, and thus won his cause. *Langdon* v. *Sherburne* (June 5, 1771) was an appeal from a decree of the judge of probate, allowing an administration account for the expenses of sale of certain real estate. "The parties, being called, appeared; and the said account being produced, it appeared to the court that the same consisted of many articles that might be better explained by the examination and report of suitable auditors, to which the parties offered no objection. Accordingly the court appointed James Stadly, and George King, Esq., and Mr. Peter Peirce (who were respectively approved of by the parties), to examine and audit said account, and to make report thereon as speedily as might be." This was the only case sent to auditors by that court. Why set out that it was done by consent of the parties, if the court had the power or was in the habit of sending even such cases to auditors, against the will of either party? So far as this case has a tendency to prove anything, it proves that auditing and referring cases stood upon the same basis, and that neither could be done without consent of parties. At a later period Governor Plumer, and his younger associates—Jeremiah Smith and Jeremiah Mason—were in active practice. Plumer's Life shows abundance of other hearings, but nothing of auditors;—see Life of William Plumer, page 162.

4. Governor Samuel Bell was the real author of the auditor act of June 23, 1823, but not of the penal and *prima facie* clauses. In his message of 1822 he said,—"The law in relation to the powers of auditors, appointed by the superior court in actions of account, requires, it is thought, revision and amendment. * * * I would therefore recommend that the law on this subject be so amended that auditors may be invested with the power to compel the parties, in causes depending before them, to produce such books and papers, and to answer on oath such interrogatories relating to the matters in controversy, as may be pertinent and material." It is hardly to be credited that an experienced legislator, scholar, and jurist, like Governor Bell, could have referred to the common law, when he used the terms "amendment," "revision," "present," &c. In the very next paragraph he says,—"It is also believed that the law relative to suits against absconding debtors and their trustees is susceptible of amendments which would render it more extensively useful," &c. We know that he here referred to a statute, because we can find it. The fact that no statute relative to auditors has yet been found is not decisive, when we remember that within the last five years at least one act has been passed that has never been

published, and whose existence is known to only three or four persons, while acts appear in the statute books which were never passed at all. In pursuance of this suggestion of the governor an act was introduced in the house, and passed by that body, but by the action of the senate was postponed to the next session, and so did not become a law until 1823. A glance at that act, and the amendment of 1836 (the revisions of 1842 and 1867 being merely condensations of the former statutes), shows conclusively that the substance of the powers of these statutory auditors—all that concerns the present case—was the creation of a period much later than the constitution of 1792, and must stand or fall upon that ground.

5. But it is suggested that the provisions of the auditor act can be sustained upon the ground that this was a branch of chancery jurisdiction exercised by the governor and council before the revolution. Governor Bell, who was in a situation to know what he was saying, manifestly did not think so;—see his message to the legislature of 1821. The suggestion in *Copp* v. *Henniker* rests chiefly upon the supposition—the guess—of Judge BELL, in *Wells* v. *Pierce*, 27 N. H. 513 ; for the authorities cited from New York, and other states which have copied its jurisprudence, have no application here. The very language used by Judge BELL, in *Wells* v. *Pierce*, shows that he had given the history (from 1692 to the revolution) of the action of the governor and council no examination, or none worthy of the name.

The supposition in relation to the governor and council goes upon the virtual concession that no other tribunal had either original or general chancery jurisdiction. If it were otherwise, why was the special power conferred by the act of 1699 upon the " inferior " and " superior " courts to chancer mortgages and penalties in bonds, &c. ? But whether conceded or not, the evidence is solid that, aside from the governor and council, no court had either original or chancery jurisdiction. There are " chasms " in the records of the governor and council, but they in no wise change the sweep and character of the historic stream. On the whole they are remarkably full. From the recreation of the courts —from 1699 to 1716—they are measurably perfect. From October 12, 1742, to May 5, 1774, they are measurably perfect. These records were indifferently termed the records of the court of appeals, and of the court of chancery, &c. They show the process, the pleadings, interlocutory motions, &c., &c. From the beginning to the end there is nothing which can, by any known distortion of the English language, be termed a chancery proceeding, in any sense in which that term is now understood by lawyers. There are suits of ejectment, of ejectment and trespass, of entry on disseizin, of trespass *quare clausum*, trespass upon the case, trover, case for slander, &c., covenant broken, debt, general assumpsit, special assumpsit, indebitatus assumpsit, with a cloud of common counts. It will be a new revelation to the profession in this state to learn that these are the ear-marks of suits in chancery. The lessons in the eight volumes of Provincial Papers, the Life of Plumer, and in Belknap's History, point unmistakably to the same

conclusion. Dr. Belknap says,—" The lords of the committee reported to the king and council their judgment upon several articles of the complaint, in substance as follows : ' That by the law of England, when lands are granted upon condition, the breach of that condition must be found by a jury, and a commission from the court of chancery ; but that no such court existed in New Hampshire ; and though the general rule was that the law of England extended to the colonies, yet it must be understood to mean such part of the law as is adapted to the state and constitution of them.' " 2 Belknap's Hist. 363.

This was in 1773, and before the revolution. English lawyers knew the difference between a court of chancery and a tribunal that had acquired its real title to that interchangeable name, because its decisions so often were equally an outrage upon law and equity, right and justice. The case of *Hilton* v. *Fowler* is an illustration. The writ in this case was dated August, 1760, and returnable at the September term, 1760, of the inferior court of common pleas. It came before the governor and council at the term of October 11, 1763. Governor Wentworth and his wife were plaintiffs in the suit. Several of the council were relatives of Governor Wentworth, who presided as chief-justice at the trial on the merits of his own case. The records are as follows :

" Present His Excellency Benning Wentworth, Esq., Governor.

| | | |
|---|---|---|
| Theo. Atkinson, | James Nevin, | |
| Richard Wibird, | Wm. Temple, | |
| John Downing, | Theo. Atkinson, jr., | of council. |
| Daniel Warner, | Nathaniel Barrell, | |
| Joseph Newmarch, | | |

M. Hunking Wentworth not present at trial." Josiah Hilton, of Newmarket, yeoman, appellant, *vs.* Philip Fowler, of Newmarket, aforesaid, husbandman, appellee." " From a judgment of His Majesty's Superior Court of Judicature, held at Portsmouth, within and for His Majesty's Province of New Hampshire, on the third Tuesday in May, being the 19th day of said month, in the first year of His Majesty's reign, Anno Domini 1761, when and where the said Josiah Hilton was appellant, and the said Philip Fowler appellee from a judgment of His Majesty's Inferior Court of Common Pleas, held at Portsmouth, in and for said province, on Tuesday the 21st day of April, 1761, by adjournment in an action of ejectment commenced at the Inferior Court of Common Pleas first mentioned, namely,—in an action of ejectment wherein he demanded," &c. [Here follows the declaration.] " In which Inferior Court of Common Pleas Judgment was rendered that the defendant recover against the plaintiff costs of court, taxed at the sum of fourteen pounds nine shillings, new Tenor bills of credit of this Province, from which said judgment the said Josiah Hilton appealed to the next Superior Court of Judicature, when and where the appeal was entered, and, the parties being fully heard by their council learned in the laws, the case was committed to the jury, sworn according to law to try the issue, who made return of their verdict thereon upon

oath, and say the jury find for the appellee costs of court. It was therefore adjudged by the said court that the former judgment be and thereby was affirmed; and that the said Philip Fowler recover against the said Josiah Hilton costs of courts, taxed at the sum of twenty pounds ten shillings, from which judgment of that said court the said Josiah Hilton moved for appeal to the Governor and Council as a court of Appeals, which was granted on condition that the appellant give security to prosecute the appeal at the first setting of the next Court of Appeals with effect; and accordingly security was given, and the said Josiah Hilton, the appellant, entered his said appeal in this court at October Term, 1761, and from thence continued till May Term then next 1762, and again from said May Term the case was continued till October Term then next 1762, when and where the parties appeared; and being fully heard by counsel learned in the law, and the court being divided in opinion, it was considered by the court that a Peremptory Judgment in the premises be suspended for the present for the further consideration of the court thereon, and that the case stand continued for that end till next term, viz., May term 1763, when it was again continued till this term when both parties appeared, when it was agreed by the parties that Richard Hilton, the mortgagor, died in November, 1743 ; and, the parties being then fully heard by counsel learned in the law, it was considered that the judgment of the Superior Court of Judicature, appealed from, be and hereby is reversed ; and that the appellant recover against the appellee the premises demanded in the original writ, and costs of court, taxed at £77 13s. 9d. N. Tenor. From which judgment the appellee prays an appeal to His Majesty's Council, which was granted, he giving bonds to prosecute his said appeal according to law, and security was accordingly given ; and the appellant also appeared and prayed that he might have a writ of possession, the above said appeal notwithstanding, which was granted, the appellant giving security to respond all costs and damages, &c., that shall be occasioned thereby in case his judgment shall be reversed by His Majesty in his Privy Council upon the said appeal ; and accordingly the appellant gave bond with sureties," &c.

The plaintiff chief-justice having succeeded in carrying a majority of his family court (see 7 Prov. Pap. 104, note; *Ib.* 338, charge "First," note (1) ; Farmer's Belknap 336, note) in favor of the plaintiffs, granted a writ of possession January 16, 1764. The sheriff returned, April 19, 1764, that he had delivered possession, and satisfied the costs, to Edward Hilton, attorney to Josiah Hilton, &c., which gave the profits of the premises until April 27, 1779, to the plaintiffs without right.

The act of June 27, 1777, passed by the legislature of New Hampshire, after reciting the history of the case at length, authorizes Philip Fowler and Jacob Fowler, devisees of the land in controversy, from Philip Fowler, deceased, to bring a writ of review in the superior court of judicature, and recover possession of the land, with costs of all the courts; to recover for the mesne profits of the land, as if judgment

had been given for them or their father in England; authorizes the court to issue a writ of possession, &c., &c. Suit was brought accordingly, and the plaintiffs obtained judgment on the first Tuesday of September, 1778, at a term of the superior court holden at Exeter, for the fifty-six acres of land, with the appurtenances, against Josiah Hilton, and for costs taxed at £28 7s. 6d. Writ of possession issued September, 1778, under the test of Meshech Weare, Esq. This writ was served by John Parker, sheriff, September 14, 1778, who put the plaintiffs in possession of the land, and paid them the costs of the suit. Subsequently a suit for mesne process was commenced by Philip and Jacob against Josiah Hilton; also, for costs and damages for preceding suits. All these suits and matters were finally adjusted by Elizabeth Hilton, widow and sole executrix of Edward Hilton, who had been one of the original plaintiffs, on April 27, 1779, and she gave a bond on that day in the sum of ten thousand pounds to indemnify them against the claims in any way growing out of the suits by and against Josiah Hilton.

The old MS. records show that the "casual ejector," suits brought by Mason, Allen, &c., were tried, against the challenge of Waldron, by juries whom the Mason interest had "qualified" by deeds of lands, standing on the same footing of the plaintiffs, proving their cases by the testimony of "two or three" of the very jurors who decided the case. Strange as it may seem, these party-witness-jurors seem to have believed their own testimony in every instance, and decided accordingly. In 1756 the governor and council decided that this court could be held by three councillors, and that the judges of the court of common pleas could review in this court the very causes upon which they had sat there, and which had been reversed in the superior court.

The Wentworth family were at this time judges of the court of probate, judges of the court of common pleas, members of the council, and *ex officio* judges in the court of last resort. Nor were the Wentworth family an exception. Wibird, Livius, and others appealed their causes to themselves. If the governor and council were a jury, and such kind of jury trial is "sacred," juries could range in number anywhere from three to eleven, and the jurymen could sit on their own cases, and could sell their decisions by private sale, if not by auction. Nothing is clearer than that the governor and council acted as triers of fact as much as any jury could, and had no jury but themselves. The same was equally true of the privy council. The two courts of last resort decided all questions of law and fact without any jury, unless they were a jury within the meaning of our law.

In the case of Livius (1768, 1769), the defendant Moffatt "utterly refused to make any answer to a demand originally made against him in said court of appeals—a court that had no original jurisdiction." This was a partnership matter, Judge Livius being the partner of Meserve and Moffat. Such a matter ought to be cognizable in equity, if anything is. The court tried hard to make the defendant "give in," but he would not, and the defendant ousted the plaintiff by his denial

of jurisdiction. If the governor and council had "supposed" that they had had original equity jurisdiction since 1692, they might have decided otherwise. In George Wentworth's case, the governor and council had remitted the cause to the superior court for trial. The superior court disregarded the mandate, but Wentworth failed to take an appeal from that decision. He brought the matter before the governor and council by petition, and asked them to enforce their mandate. Notwithstanding the old acts, to which reference has been made, giving the provincial courts the powers of the king's bench exchequer, &c., the governor and council, in this case, at the May term, 1774, held that "this court have no jurisdiction of any causes but such as are brought before them by appeal."

Governor Plumer was born in 1759, and was reared in the very atmosphere of this court. His life says,—" Under the colonial government, causes of importance were carried up, for decision in the last resort, to the governor and council, with the right, in certain cases—a right seldom claimed—of appeal to the king in council. As the executive functionaries were not generally lawyers, and the titular judges were oftener from other professions than the legal, they were not much influenced in their decisions by any known principles of established law. So much, indeed, was the result supposed to depend upon the favor or aversion of the court, that presents from suitors to the judges were not uncommon, nor perhaps unexpected. On one occasion, the chief-justice, who was also a member of the council, is said to have inquired, rather impatiently, of his servant, what cattle those were that had waked him so unseasonably in the morning by their lowing under his window; and to have been somewhat mollified by the answer that they were a yoke of six feet cattle, which Col. —————— had sent as a present to his honor. 'Has he?' said the judge;—'I must look into his case; it has been in court long enough.'" Life of Plumer, pp. 149, 150; 3 Belknap's Hist. 256.

The representatives of the people have not left us in the dark as to how they regarded this court. On January 10, 1727–8, the house of representatives solemnly set forth that, "Whereas, the Court, Sometimes Called a Court of appeals, and Sometimes the Court of Chancery, assumes an arbitrary power without foundation or precedent, and whose proceedings are Neither by Juries, Nor any Known Rules and Laws, which renders the Estates of his Maj'ties good Subjects within this Province most precarious, and their Circumstances most Deplorable, which has ocasioned a Generall Cry for Relief under So heavy a Burthen; and, whereas, his Hon'r the Liv't Governor has Signified to us, upon application Made to the hon'ble Board, That his Instructions forbid the Disolving any Court already erected, and, therefore, that wee May Expect Noe remedy from him," &c. They voted to appoint an agent "to appeare at the Court of Great Brittaine, and Memoriall to his Maj'tie the Grievances before mentioned, and to Implore his Grace and favor in ordering the Disolving the Said Court; or, if that may not be, then a New Regulation of It, as in his Princely wisdom Shall

Seem Right." The governor and council, in their reply, made no claim that they proceeded according to the course of chancery, but said,—" the Board thought the vote highly reflected on the Board, in Saying that the Court of appeals acted without Law or president, and that the Same was a Scandalous lible ; " and voted " for the house to Retract their vote." The house refused. The two houses had " a Conference about the Dispute about the Court of appeals." A committee was appointed " to Draw up Some Scheam, for altering or additionall Regulating the Court of appeals, before the Governor and Councill." The aristocracy, represented in the council, refused to give way, and the governor had to dissolve the assembly. 4 Prov. Pap. 479, 480, 481, 485, 489 ; *Ib.* 272, 273, 275.

Settlers began to move into the lower part of the province about 1623. They were rough, hardy, independent men. They came from anywhere, were outside of all government, and responsible to none. They claimed all the inherent rights of Englishmen, and set up a kind of squatter sovereignty of their own. They increased in numbers till they were made a part of Massachusetts. In 1680, the squatter sovereigns and their descendants, against their will, were made into a separate province, for the sole purpose of enabling Mason, " the Lord Proprietor," as he styled himself, to rob them of substantially all they had— their lands. From this time until the revolution, four fifths of all the lawsuits were about real estate, or troubles that arose on account of it. Mason and his creatures, Barefoot and Hincks, and Cranfield and the land-pirates, and the " quality," as they styled themselves, always potential in the council, were on one side, and the squatter sovereigns, their allies, and descendants, on the other. They never mixed, though sometimes the outside pressure of the fagot, the scalping-knife, and the tomahawk, forced them to act as one. Occasionally, a governor favored the " comons," as Governor Dudley three times termed them in one message ; but, in general, his mailed hand was on the throat of the squatters. Neither party really cared for the right of trial by jury in civil causes, except in relation to real estate. If the squatters could have secured that, they would have abandoned it cheerfully as respects everything else. If denied as to real estate, the court party were content. There was little trouble in this respect from 1699 to 1702 ; but from 1702 to 1715 the people intensified in bitterness toward the governor and council. A brief lull ensued ; but the controversy soon revived, and culminated in the explosion in 1727, already referred to ; though the bitterness after 1750 was less than before. An appeal, when the amount in controversy exceeded £50 or £100, lay, in all cases, to the governor and council. This tribunal decided that the costs in the tribunal below went to make up the jurisdictional amount. Causes were appealed from the general sessions to the common pleas, from the common pleas to the superior court, and from that to the governor and council. In every appellate court, except the latter, they were tried upon issues framed much after the pattern of our probate appeals ; but the governor and council always tried causes without the

aid of a jury. They assumed to try them upon their " merits." When they felt like it, witnesses were examined before them orally, and they decided what facts were proved, and what not. The squatter sovereigns had a trial by jury, which came to nothing when they reached the court of last resort; while the aristocracy and land-pirates regarded this court as their stronghold, and successfully resisted every attempt to change its constitution and mode of procedure.

On January 3, 1727–8, the house of representatives attempted to prohibit the superior court from granting appeals to the governor and council. On January 4, 1727, the house set forth,—" Whereas, there has Sundry Inconveniences arisen within this Province concerning the Tryal of Titles of land, psons being at exterordinary charge : That when they have gon thro the Inferior & Superior Courts The has been appeals to Governr & councill, by which Reason Exterordinary Expense and Difficulties Do and may arise, for Remedy Whereof, voted, That, in all cases where Title of Land is in any ways Concerned, actions shall commence first at the Inferior court of Common pleas, and, in case any one appeals from ye Judgmt and Sentence of said court to the Supr court of Judicature, that there shall be a finall Issue and end thereof, unless the Matter or Cause Exceed the True vallue of three hundred pounds sterling ; that then any party may appeal to his Majtie In councill ; and that noe appeale be otherwise granted where Title of Land is Concerned, any Law, usage, or Custome, to the contrary thereof in any wise Notwithstanding ; and that an act be Drawn up accordingly." On January 9, 1727–8, in the house, " A vote was Drawn up, and passed, to have a jury at the Court of appeals before Govr & councill ; and that each of ye councill take an Oath as Shall be prescribed. The vote on file was sent up." The same day, " The above vote Brot Down Non concurd, and a messa That if some proper Oaths was Drawn up the councill would Readyly take them."

On January 8, 1727–8, in the house " The vote for a Jury at the Court of appeals was Sent up again with a Message to pray the Board to reconsider the vote,"—4 Prov. Pap., pp. 475, 476, 478. Dr. Belknap says,—" The triennial act being passed, the House were disposed to make other alterations in the government. An appeal was allowed in all civil cases from the inferior to the superior court; if the matter in controversy exceeded one hundred pounds, another appeal was allowed to the Governor and Council; and if it exceeded three hundred pounds, to the King and Council. The appeal to the Governor and Council was first established by Cutts's commission, and continued by subsequent commissions and instructions. In Queen Anne's time, it was complained of as a grievance that the Governor and Council received appeals and decided causes without taking an oath to do justice. An oath was then prescribed and taken. The authority of this court had been recognized by several clauses in the laws, but was disrelished by many of the people ; partly because the Judges, who had before decided cases, were generally members of the council, partly because no jury was admitted in this court of appeal, and partly because no such

institution was known in the neighboring Province of Massachusetts. The House moved for a repeal of the several clauses in the laws relative to this obnoxious court; the council non-concurred their vote, and referred them to the royal instructions. The House persisted in their endeavors, and the Council in their opposition. Both sides grew warm, and there was no prospect of an accommodation. The Lieutenant Governor put an end to the session, and soon after dissolved the Assembly by proclamation." 2 Belk. Hist. 90, 91.

With the revolution a new era was inaugurated. The squatter sovereign idea, in relation to " trial by jury," came uppermost. On June 28, 1776, under the plan of government of January 5, 1776, they abolished " the court of appeals in this colony," &c. The preamble was in these words : " Whereas, the granting such a Multiplicity of Appeals from Court to Court, and Trials consequent thereupon, as hath been heretofore practiced in this Colony, hath been found to promote Litigation, to protract Suits, and increase the Charges thereof, rather than to serve the Ends of Justice in this Colony. And, whereas, the allowance of Appeals, in any Cases, to said Court of Appeals, or to the King of Great-Britain, is depriving the people of this Colony of their great, inestimable, and inherent Right of Trial by Jury, and opening a Door for arbitrary Decisions of their Property, even in Causes of the greatest Moment."

Dr. Belknap says,—" The new assembly begun their administration by establishing Judicial Courts, on the same system as before, excepting that the Court of Appeals, which had long been esteemed a grievance, was abolished, and all appeals to Great Britain were prohibited." 2 Belk. Hist. 406.

*Copp* v. *Henniker* assumes that every person in the province, in general, had by law a right to a trial by jury. It is unnecessary for us to consider in this case in what sense, if at all, that is true. The pre-revolutionary jury trial, or right, was one thing in criminal, and—if it had an existence—a very different thing in civil causes. No criminal cause could by law, or did in fact, come before the governor and council by way of appeal. Civil causes did, and were finally determined where no juries ever came. If in any fair and honest sense there was before the revolution a right to a trial by jury in this province, in civil causes, we have shown its " impairments " in a few particulars, which we fervently trust have not been made " sacred " and " inviolate " by the constitution of 1792. It is possible that we may have occasion hereafter to refer to other " impairments." Add the auditor act, with its penal and *prima facie* clauses, to the other " impairments," and it seems to us that this pre-revolutionary right of trial by jury becomes a minus quantity.

It is true that, when the entire province had less than four thousand people, Mason and his tools—Barefoot and Hincks—assumed to act as chancellor and assistant chancellors in two matters which concerned Mason—and perhaps others. 1 Prov. Pap. 474, 502, 503.

There is no evidence, that I have been able to find, which has any

tendency to show that the high court of chancery, of the act of 1692, had any existence after the act of 1699, already referred to, or, indeed, after this province went again under the wing of Massachusetts, or that anything was done under it more than under the Massachusetts statutes of 1692 and 1693. The powers of the governor and council in the two provinces were not, as Judge BELL seems to assume, identical. *Sparhawk* v. *Sparhawk,* 116 Mass. 317, 318.

Prior to 1641–2 no such thing was known among the squatter sovereigns of this province as any kind or form of chancery jurisdiction. Judge SMITH's address, 6 N. H. Hist. Coll. 169, 173, 191, 192, 193, 194 ; 1 Belk. Hist. 37, 51, 52, 65, 67, 76, 77, 79, 100, 106, 114, 115. From that time until January 22, 1680, Massachusetts, of which this province was a part, exercised no such jurisdiction here, as will be seen hereafter. For obvious reasons, no such jurisdiction was created until the death of Cutts, April 5, 1681, nor until after Waldron vacated his place on the arrival of Cranfield, October 4, 1682. Cranfield created courts in the interest of his patron, and probably appointed Mason chancellor, &c. His power was denied by the people. One of their articles against him was, that that power belonged to himself and the assembly, and that in such creation of courts, &c., by his sole act, he had exceeded his commission. 1 Prov. Pap. 516, 517, 556 ; 8 N. H. Hist. Coll. 385. In 1683–4, he seems to have acted as chancellor in three cases. 8 N. H. Hist. Coll. 152, 153, 154, 193 (21), 312, 313, 314, 315, 316, 317. Cranfield left the country May 15, 1685, which seems to have been the end of Mason's chancellorship. Mason left in May, 1686, returned in the spring of 1687, and died in New York in August, 1688.

These commissions were a species of constitution. The first—that of Cutts—authorized the governor and council to establish courts, &c. All succeeding commissions contained substantially the same clause ; but Allen's instructions provided,—" You shall not erect any Court or office of Judicature, not before erected or established, without Our especial Order." There is not a particle of evidence to show that any chancery powers were given to the governor and council, or that they assumed to exercise any, prior to Allen's instructions ; and after that the governor and council refused to consent to the creation of new courts, upon the ground that these instructions, or subsequent ones of a like character, made it their duty to resist such changes. 7 Prov. Pap. 154, 155.

Under the new order of things, flowing from the revolution of 1688, by laws passed in 1692 both Massachusetts and New Hampshire created high courts of chancery, with original and general equity jurisdiction. For this neither the king nor his council gave any " especial order," nor did they afterwards lend their approval. In consequence, this great court of chancery in Massachusetts forthwith dropped out of existence ; and it is a singular fact, that in that state no attempt was made to establish such a general jurisdiction in equity for one hundred and sixty-five years, though special powers, like that of 1785, were

sprinkled along from time to time by the statute-factory. When these courts were created, New Hampshire had about 4,000 and Massachusetts about 40,000 people. Why should a high court of chancery be kept up for nearly a century for the former, and not for the latter, when Massachusetts had ten times the population and a hundred-fold more wealth than New Hampshire? Why should limited and special chancery powers have been given here in 1699, by statute, if we then had a court of general chancery jurisdiction? The fact that no record or other evidence exists, tending to show that any chancery procedure existed in this province from 1692 to 1775, and the further fact, which appears of record, that the governor and council decided that they had no original jurisdiction, tends strongly to show that the " supposed " chancery jurisdiction here, before the revolution, was a myth. If chancery powers were exercised here at all, it was not by the governor and council, but by the general assembly, which, at the very time to which Judge Bell alludes, was reviving rules of reference, cancelling executions, striking off judgments, blotting out levies, setting aside fraudulent conveyances, and relieving against judgments, granting divorces, and making orders about alimony, and sometimes, though rarely, granting relief upon the avowed ground that there was " no remedy at Comon Law." 4 Prov. Pap. 229, 420, 439, 503, 530, 538, 570, 607, 652, 656, 675, 676, 788, 798, 799, 804 ; 7 Prov. Pap. 22, 24, 49, 58, 66, 67, 70, 82, 83, 84, 93, 95, 97, 98, 109, 112, 113, 118, 123, 148, 152, 158, 159, 164, 183, 197, 206, 216, 221, 238, 242, 258, 272, 273, 279, 283, 291, 303, 304, 308, 317, 318, 319, 324, 351, 368.

Parliamentary omnipotence lay at the bottom of this jurisdiction. It matters not that petitions, &c., were not always granted. The power to do so was assumed and exercised by the general assembly. The auditor law cannot rest upon that which had no existence. We are aware that the governor and council sometimes acted as a legislature, sometimes as a " star-chamber," sometimes as a supreme ecclesiastical tribunal, sometimes as a grand jury, sometimes as a court of pardons, sometimes as a court of bankruptcy, and often exercised despotic power. But none of these things made them a court of chancery.

If the constitution gives the right to a jury trial in civil causes, where the contrary was not practised in this province before the revolution, and if chancery jurisdiction had no existence here, why would not the parties thereto be entitled to a jury trial, as Judge PARKER decided, as much as they would if such causes had never existed until since that time?

6. But it is often suggested that if the auditor law is unconstitutional, it has been made constitutional by the acquiescence for half a century. The supreme court in *Francis* v. *Baker, ante,* have answered that objection : " The fact that the constitutionality of similar acts, long existing in other states, has not been questioned, is a fact which cannot be disregarded. The fact, however, is not decisive. An unconstitutional act which is not too often used, and which when used works well, may be tolerated without question. In our own state, the act

contained in the Digest of 1844, which was in force many years, created little or no dissatisfaction, for the reason probably that it was very seldom applied in any case where either party strongly objected." But if that court had not, ours settled the question,—when speaking, in *Merrill* v. *Sherburne*, of a species of legislation which had existed here under various forms of government in substance for nearly a century,—twenty-seven years of which was under the constitution of 1792. They say,—" Nor could it be pretended, on any sound principles, that the usage to pass them, if uninterrupted for the last twenty-seven years, would amount to a justification, provided both the letter and spirit of the written charter of our liberties forbid them. That charter is the supreme law of the land to us all." *Merrill* v. *Sherburne*, 1 N. H. 217.

" Under the colonial government an appeal was allowed from the ordinary tribunals, in certain cases, to the governor and council. During the revolution, the same practice of going beyond the courts of law for redress was continued ; and the form which it took, under the constitution of 1784, was that of a special act of the legislature, ' restoring the party to his law,' as it was called—that is, giving him a new trial in the superior court after his case had come to its final decision in the ordinary course of law." Life of Plumer 170.

In *McClary* v. *Gilman*, Governor Plumer argued that such an act was unconstitutional. At the September term of the superior court, in 1791 (PICKERING, C. J., DUDLEY, OLCOTT, and FARRAR, JJ.), upon some ground or other held the act unconstitutional. Other decisions were afterwards made the other way. But it did not change the current of these applications. The legislature was beset with them. The preamble to the act of December 22, 1808, says,—" Whereas, petitions are often preferred to the General Court, praying for the restoration to a course of law ; which mode of relief is not only burdensome to the Legislature and the State, but also extremely expensive to individuals, who often live at a great distance from the place of holding said Court."

Even as late as 1818 and 1819, both branches of the legislature had a standing committee on " restoration to law," &c. The purpose of the act of 1808 was to put the superior court in the place of the legislature as to such applications. The hearings on such petitions before these committees were public. The witnesses were heard under oath. The parties were heard by their counsel—oftentimes the Titans of that day—Mason, Smith, Plumer, and the like. The merits of the cases were sifted with great discrimination. Many applications were rejected. Daniel Webster won the act for a re-trial of *Merrill* v. *Sherburne* before such a body. The superior court set aside that act in September, 1818. However clear that doctrine may seem to us,—*Ashuelot Railroad* v. *Elliot*, 52 N. H. 387,—it was far from being considered as clear then. The newspapers of that day criticised that decision with unexampled freedom and bitterness. Governor Plumer signed that act. He had not forgotten that as counsel he had argued the opposite

view in 1791. He was an able man, and as conscientious as he was able. The man whose scruples would not permit him to sign the bill giving Mary Dyer a divorce, never signed the act which the court set aside in *Merrill* v. *Sherburne* without believing in his heart that it was constitutional. Mason defended its constitutionality before the court. Sullivan and Atherton, and other lawyers but little less noted, took the same view. The legislature received the opinion with incredulity. In this they were not alone;—see Am. Law Rev., July, 1875, pp. 750, 751. On June 24, 1818, they put to the court this question : " Has the legislature a right to grant new trials in any case, and if so, in what cases ?" The three judges enclosed a copy of the opinion in *Merrill* v. *Sherburne*, and stated that they all concurred in its statement of constitutional principles, though Judge RICHARDSON had been unable to sit in that cause, having been of counsel. They assumed that it was for the court to decide under what circumstances it would be proper to give an answer to the questions of the other branches of the government. They refused to make any further answer, for the following reasons : " But it would be impossible to foretell that among the complex and ample subjects of legislation, cases might not arise, where statutes in relation to the concerns of individuals, which clearly have been adjudicated, would be warrantable. It deserves remark, also, that neither the opinion nor resolve extends to any cases of probate, or other proceeding, on which a judicial decision had not been made at the time of the interference of the legislature."

That Governor Plumer, Governor Bell, Judge Woodbury, Webster, and others, were able lawyers, and had no thought that the auditor act was in violation of the constitution, is conceded. But the court must bear in mind, that substantially the whole body of constitutional law in this state has grown up since that time. Prior to the revolution in non-political matters, as we have seen, subject to the theoretical restraint of the negative of the king, or his governor, the general assembly had in general assumed and exercised the omnipotent powers of the British parliament. The revolution, for the time being, made everything the creature of the legislative power. For over forty years after that the people laid all their grievances before the general court for redress ;—see numerous instances in the Journals of the House, 1791–1793. It was then the court of last resort, both of law and of fact. No first-class lawyer ever sat upon the bench of the superior court before Jeremiah Smith. For more than a century the judges had been lumber-men, merchants, doctors, broken-down ministers, and hucksters, with now and then a poor lawyer. Chief-Justice DUDLEY, at Charlestown, sending Jeremiah Mason's demurrer to the jury, upon the ground that such " new-fangled law " was " a cussed cheat," and that any other course would be " fatal to the rights of the jury," illustrates the whole system in its best estate ; for DUDLEY, though illiterate and no lawyer, was an able man, and for twelve years chief of our highest law court. The bar was small and able ; but under such a state of

things the law was a chaos—not a science. This volcanic, chaotic, and transition period of our history was in the highest degree unfavorable to legal education and science, and especially a new science like that of constitutional law. Neither "acquiescence," nor the authority of great names, saved the unconstitutional act in *Merrill* v. *Sherburne.* Why should they now save the auditor act in *Perkins* v. *Scott?*

The question is raised here between the parties to a suit. It concerns them and the judicial branch of the government alone. The defendant is in no fault because he was not born sooner. He has taken this exception at the earliest practicable moment. There is no safety for the rights of men, if its sworn guardians, because of lapse of time, are to turn aside from the plain path of the constitution, and remit us all to chaos.

[NOTE. The state historian, Dr. Bouton, in his letter of July 10, 1875, in answer to our inquiries in relation to a court of chancery, after reciting much historical matter, says, among other things,—" that unless the law enacted in 1692, establishing 'a court of chancery,' be an exception, I find no evidence, trace, or record of such a court, as distinct from the court of appeals, a court of relief [Mason sitting as chancellor], and a supreme court of probate, of which the Governor and council were the sole members." We may add, that we have examined every authority, whether in print or manuscript, to which he refers.]

III. The statutes authorizing the reports of auditors and referees to be given in evidence, though substantive in character, are yet incidental to the main provisions which empower the court to send causes to them. If the main provisions cannot stand, the consequential ones cannot. In *Copp* v. *Henniker* there are two decisions—one formal, and the other informal. The former is based mainly upon authorities outside this state, and the latter mainly upon reasoning. The first is, that a law is constitutional which drives a party against his will to a trial before a hybrid inquisition, where the same person is a jury, chancellor, and court of law—a tribunal unknown in 1792 ; and the second is, that the law is unconstitutional, so far as it imposes a penalty upon the exercise of the right of trial by jury. The jury fee, appeal, &c. (in case they had no existence in 1792), are cited as illustrations of the principle. These two decisions cannot stand together. If one is sound, the other is unsound. It is not necessary that the statute should term it a penalty, or fix a precise amount. If in substance a penalty, its name, form, kind, and character are immaterial. It is enough if the statute, when applied in any particular case, operates as a penalty, and *the rules of court must fall with the statute.* Driving a man to a hearing against his will before such a tribunal is not only a " weariness to the flesh," but is necessarily a penalty in time and expense, though its extent may vary with the circumstances of each case. Is not a court constitutionally a part of the machinery of a jury trial ? Can a jury trial, in a constitutional sense, be had, without a court at the same time to discharge its appropriate duties ? Can the legislature abolish all courts, and constitutionally make each jury a supreme court of law and chancery ? Could they constitutionally have passed a law whereby the jury, in the present case, could have decided the constitutional

questions raised by it? Does not the jury right include the dual functions of court and jury? In a constitutional sense, can they exist when separated any more than the Siamese twins? Can the legislature say that the parties cannot have a jury trial for two or for ten years? Can they do by indirection what they cannot do directly? If the parties have the right to a "speedy" jury trial, can they fetter that right by burdening them with the delay, vexation, and expense of another trial, before they can exercise that right? If the legislature can burden them by sending them to one inquisition, why not by sending them to ten, or a hundred? Where is the constitutional line to be drawn—where are the limits to be fixed?

Though there are some passages which seem to look the other way, we are unable to make less of the opinions of a majority of the court in *Copp* v. *Henniker* than this: the referee act is to be overthrown as unconstitutional, but the auditor act is to be saved. Against the latter we protest. In a constitutional sense, it is more objectionable than the referee act. The right of trial by jury exists in the class of causes which may be sent to auditors, if it has any existence. The penalties imposed by the auditor act are distinct. The delays in such trials are notorious. If either party refuses to go to trial before the auditor,.he forfeits his right of trial by jury, and a nonsuit or default goes against him. If he is a plaintiff, and goes to trial, and a report is made against him, three penalties are imposed upon the exercise of his constitutional right : he must bear the expenses of the trial ; he must pay the penalty of the report against him ; and, when he gets to the jury, the make-weight of the report, which the jury must follow until it is overthrown, is tied like a millstone to his neck. If he is a defendant, and the report is adverse to him, he must bear the burden of the expense of a trial. He must go to trial with a millstone in the hands of the other party weighting him down, and, if beaten, must pay the cost of the manufacture of the instrument of his destruction. But the constitution has conferred no power to compel parties, by forcing delay or otherwise, to try their causes before a court of conciliation. That instrument is not a bundle of farces. If a cause can be sent to such a court (as they have repeatedly been) against the will of both parties, or upon the motion of one party against the will of the other, a penalty in time or money is necessarily imposed upon one or both.

*Norris*, for the plaintiffs.

Is the provision of the auditor law, making the report *prima facie* evidence to the jury, constitutional? It is a fact beyond question, that it has been in force, and for the most part in active enforcement, for over half a century. It has been taking reports of accounts stated before the jury all our lives long. Great lawyers and judges have grown old and died here in its time. Courts have been remodelled, judiciaries overturned, and our General Statutes all twice revised. It is no stranger to our reports, antedating all but two of them with its title

in the digests; and, until the referee law came to be questioned, none of the profession ever mistrusted it was in conflict with the constitution. During all these years, too, trial by jury has to some extent been losing its prestige. Amid the perversity and progress of this world of ours, men have been driven to various expedients to save their liberties from usurping tyrants. Trial by jury is one of them. It is worthy of remark, also, that our constitution contains a mandatory clause of revision. It was framed in close convention, but enacted in open town-meetings, receiving on its own motion a kind of new birth every seven years from the same town-meetings. "Constitutions speak from the time of their adoption." When does ours speak from? As the auditor law has had the sanction of seven such re-adoptions of the constitution, and has thus itself grown into a sort of "unwritten constitution," it may be defended on that ground, as well as on that of general "acquiescence because of its practical convenience."

It makes no odds whether this provision be the child of statute, common law, or equity, here, provided it go not beyond the bounds of equity and common law. Nor does it seem to me to be any more than making three or five minutes' testimony of a party *prima facie* evidence of his case in the absence of everything to the contrary. It may be said the evidence of these reports varies with the nature of the tribunal it emanates from, becoming in some cases nearly or quite conclusive. And so does and may the testimony of parties, and for the same reason. We have other statutes tending in the same direction; and no court, we trust, will disturb this pioneer of them, unless compelled by "fetters of logic," or by the clear light of history.

But the defendant derives some comfort from *Francis* v. *Baker*, a case recently decided in Rhode Island. And at first view that case seems to stand in our way; but its seeming obstructions are not formidable. Rhode Island's statute on the subject is much more modern than ours, and so is her constitution. It provides that "the right of trial by jury is to remain inviolate." It has no qualification or limitation, and the question in that case was, whether the common law right had been violated. Here we encounter no such question; and hence, granting all that is claimed, that opinion is not in our way, because the road is still open for us to come in under our limitation. But that decision is put in terms on no higher ground than a choice of followings between a recent opinion in one state and the long continued practice in two others. We think it a poor choice they made. But at most, and best, it is but a choice, entitled to little or no weight as authority.

And when we turn to *Plimpton* v. *Somerset* for a forcible presentation of their "argument," we find the "argument" predicated on a statute much broader than theirs or ours, and, as to a cause of action, not germain, nor hardly akin at all, to the one pending here or there. Our action is on mutual dealings with accounts and vouchers; theirs, on "book account, with divers notes and checks;" and the one the "argument" is made on, "for damages from defective highway."

And the argument concedes that " there are many cases in which, by the custom of the common law, no jury trial can be had even in the common-law courts ; " clearly recognizing the doctrine of *Whitwell* v. *Willard,* 1 Met. 216, that an auditor may be " an officer either at law or in equity." It was, too, a decision by a divided court, made over a dead statute that left few friends, and this one case its sole estate.

Our case went to the auditor without objection, by tacit consent, if not by agreement. Although the court in Rhode Island held that that makes no difference, we think that an agreement or consent to go before a tribunal for hearing ought to imply an agreement or consent to submit to all the known effects of its findings. How else need there be any plea to the jurisdiction in any case till after an adverse decision on the merits ? or, can a general appearance cure any defects ? What are laches in laws, if one may come into the court, take his chances before a jury, and then plead to the jurisdiction in arrest of judgment ?

Here perhaps I ought to stop, suggesting that the plaintiff's counsel has made a very able argument on my side, weakened perhaps by allusions now and then to the court, or some members of it, by way of " suggestion." But his attack is a feint. What he really aims at are the prospective " distinctions " to run between auditors and referees, and the use to be made of their reports. " So far as they both go," he says, meaning, of course, so far as they go together, the two statutes " occupy the same ground." So far, so good. And there need be no distinction on this " ground," because that lurks, if anywhere, on ground where they do not go together. Auditors only " state accounts between parties." Referees decide causes " by law, triable by a jury," and " questions of fact, not by law, triable by a jury," before invading the auditor's province. Here, then, surely, is a distinction with a difference.

But even if these statutes must stand or fall together, we go for them both standing. We believe in them both. We think neither of them need alarm the best friend of jury trials. " Except in cases in which it has been heretofore otherwise used and practised " may be a pretty broad exception. It is itself evidence conclusive that some such cases existed. What they were is the question. And this, counsel says, we are bound to prove. But there are very respectable authorities the other way. " Acts of the legislature are *prima facie* legal." *Rich* v. *Flanders,* 39 N. H. 304 ; *Lafayette* v. *Jenner,* 10 Ind. 70. But the burden of proof is well settled here, as our own case, just cited, says " no statute will be declared void, unless its invalidity be placed beyond all reasonable doubt." By " cases," and " used and practised," is meant forms of action and modes of procedure ; and when a "case" is found within the exception, no matter how it was otherwise used and practised, we may do with it as we please, for all the jury right. And " heretofore " covers an indefinite space of time. It begins with the constitution, and runs back to the time found by counsel, when " neither party really cared for the right of trial by jury in civil causes, except in relation to real estate." And " from the earliest times," he says, " the files of the court fairly swarm with references." He is right. So

far as my own examination has been extended, and it went over considerable space, he has not overstated the result. At the very first session of the legislature, under our present constitution, in an act then passed giving parties " one review, or new trial, after judgment rendered" in the various courts, judgment on " report of referees" is included. What effect was given these reports before judgment is the real question ; and this question is to be answered in the light of the authorities just cited, that an act of legislation impeached has the presumption of innocence in its favor, and is to be tried by the rule of removing all reasonable doubt of its nullity.

In *Plimpton* v. *Somerset,* the whole argument is based on the ground assumed, that their right of jury trial is the same as that of the common law. It may be tested by the syllogism : the right to a jury trial in that state is the same as that right by common law, and any act of legislation impairing that right is unconstitutional : the act in question, as applied to the cause in question, impairs that right : therefore, in so far, it is unconstitutional. Either premise proving untrue, the conclusion fails. Nobody claims the major to be true here. Our bill of rights excludes that notion, hence that case is no authority here ; and most likely the great light of that bench, then just retiring from it, who made the *pro forma* ruling but took no part in the decision, hesitated on the same premise; for in private, he " confesses to a good degree of liberality, if not of latitude, in defining the powers of legislation over what cases shall be tried by jury and what ones not, and what limits to such trials may be imposed." With us the argument tested stands : certain forms of action are entitled of right to trial by jury, and any act denying that right is void : a given act has that effect in a given case : hence, in so far forth, the act is void. And this puts us out to sea on the " historical test " question,—my brother's " river of time," with " its ebbs and floods,"—which must be left pretty much to the court for navigation. Nor need we take the risk of either wind or tide in such a voyage, before the presumption even of the validity of our client is impaired. Enough is found on the shore surface of this " sea of troubles," aided by the spirit of the age, to put us on our guard against casting any stumbling-blocks in the way of legal reform.

We are reminded that " this method of procedure shall be held sacred." Granted. But care must be taken lest it run into idolatry ; because no one ought to construe organic or ordinary legislation who rides a hobby to the work. " Making such laws as the public good may require " is a duty the bill of rights enjoins on the legislature. No one claims that this office is to be magnified, in the face and eyes of the right of jury trial. Both are to be construed together ; and we have a right to insist that one shall not be fed at the expense of the other, and that each, if need be, shall on occasion have a liberal construction.

Both statutes under consideration are a stage each in advance, and, we think, in the right direction. One has had a long trial, and worked well ; and whether the other turn out a millstone, or a life-preserver,

about the neck of litigants, is a question of probation to be solved by legislative discretion, and not by judicial construction.

CUSHING, C. J.  I do not think this report ought to be set aside. The affidavits taken together do not satisfy me that any objection as to interest or bias is made out which ought to furnish reason to the party for recusing the auditor.  Neither do I think that the report ought to be set aside on the ground that the auditor law, so called, is unconstitutional. I understand the objection to be, that that part of the statute which makes the report of the auditor evidence to be used before the jury is in violation of the party's constitutional right to a trial by jury.  This provision is an integral part of the statute.  It is impossible to dispense with that provision, and leave that part which provides for sending causes to auditors with the meaning and force which the legislature intended to give it.  If the auditor's report cannot go to the jury, the court cannot send the case to an auditor.

This being so, I think it clear that the objection must be taken, if at all, at the time of the reference.  The party cannot be permitted to lie by and take his chance of getting a favorable report, and then, if he is not satisfied with it, cause it to be rejected.

I also hold, for reasons assigned in my dissenting opinion in the case of *King* v. *Hopkins*, Hillsborough June term, 1876, that the law is not unconstitutional.

LADD, J.  The historical researches of the defendant's counsel appear to leave our information with respect to the origin of the auditor law in this state about where it was before.  As a statute, its first appearance, so far as now appears, was in 1823 ; and it was then enacted in pursuance of the recommendation of Governor Bell, in his message of the year before, that the law on this subject be " amended."  It is conjectured that there was some kind of a statute on the subject in existence at that time, which is now lost; and it is said that the language used by Governor Bell gives countenance to that conjecture. It has also been conjectured that Governor Bell referred to the common law, and the practice of the courts thereunder ; and the failure to find any prior statute, either published or unpublished, may be thought to give countenance to that conjecture.  Further examination may settle the matter one way or the other ; but, so far as regards the question raised in this case, I do not see that it makes any great difference which supposition be adopted.  It is certain that in the act of 1823 no allusion is made to any prior statute, and the report of an auditor has always since that time been legally admissible as evidence for the jury to consider in cases coming within its terms.

If there was such a statute prior to 1823, passed either before or soon after the constitution, it would furnish almost if not quite conclusive evidence that the right of trial by jury, in matters of account arising in suits at law, was understood either not to exist at all, or to exist only in this modified form.  If there was no statute, we should naturally

next turn our attention to the practice of the courts, expecting to find there the same kind of evidence—that is, contemporaneous construction. But if no statute and no practice are to be found, as the defendant's counsel seems to hold, then, of course, we must look to some other quarter for light, or else decide the question in the dark.

It might be said that it is incumbent on one, who maintains that the qualified jury trial, allowed by the act of 1823, in causes involving matters of account, is an infringement of the jury trial of the constitution, to show that a jury trial in such cases, unqualified and untrammelled by the provision that the auditor's report should be evidence, was matter of absolute right at the time of the adoption of the constitution. But at this point we are confronted with the views of the majority of this court, as expressed in *Copp* v. *Henniker*, 55 N. H. 179 ; and it is said that the history of the jurisprudence of the province and state not only fails to show that a jury trial was uniformly " used and practised " in any case or class of cases before the constitution, but does show, on the other hand, affirmatively, that the contrary was true. The upshot of the argument, if I understand it, being to show not only that the defendant's claim in this case is utterly groundless and untenable, but that the majority of the court in *Copp* v. *Henniker* were wrong, for the same single, broad, and sweeping reason that there were no cases of any sort in which trial by jury can be said to have been the use and practice before the constitution, and so no cases to which the solemn mandate of that instrument enjoining that the right shall be kept sacred could be applied.

It seems quite clear that the defendant argues himself out of court ; for if, during the period of our provincial history, there was no class of civil cases in which a trial by jury could be claimed as matter of legal right, it must follow that whenever by the grace of somebody—the omnipotent provincial legislature, the judicial governor and council, or the court—such trial was granted, that trial might be of just such character and possessed of just such attributes and characteristics as might be dictated by the opinion, the interest, or the caprice of those by whose favor it was allowed. And that being so before the constitution, by the express language of that instrument it would continue to be so afterwards ; and when the legislature undertook to grant and establish, in any case, a right which the framers of the constitution so egregiously failed to fix, they might, of course, give it in just such form, subject to just such restrictions, limitations, burdens, and penalties, as they saw fit.

The constitution of 1784, as well as that of 1792, under which we now live, provides that " In all controversies concerning property, and in all suits between two or more persons, except in cases in which it has been heretofore otherwise used and practised, the parties have a right to trial by jury ; and this method of procedure shall be held sacred, unless, in cases arising on the high seas, and such as relate to mariners' wages, the legislature shall think it necessary hereafter to alter it." Bill of Rights, Art. 20. A serious argument to show that

this solemn declaration in our bill of rights means something—that it is not a mere piece of turgid and high-sounding declamation, without force or effect as the supreme law of the state, for the reason that when it was uttered there were no cases in which it had not been theretofore otherwise used and practised—will doubtless be thought a novel production.  But, unless the defendant's case is to be decided against him upon the ground taken in the argument, which has been urged upon us by his counsel, it seems necessary to notice briefly the somewhat startling proposition on which that argument is based.

It may safely be assumed, I think, that those who drew up and adopted the constitution entertained the honest belief that they were placing in that instrument something more than a well rounded period of empty verbiage.  With the judicial history of the mother country for the last century and a half before them, with all the details of the fierce and protracted struggle between the people and the Masonian proprietors fresh in their minds, and with the eloquent and almost poetical panegyric of Sir William Blackstone (3 Bl. Com. 379), then lately given to the world, ringing in their ears, it is reasonable to believe that they were stimulated by a purpose to secure to the people of the state, beyond legislative interference or control, the benefits and advantages of the system which the great commentator so brilliantly portrayed ; and to protect themselves and their posterity against the evils and mischiefs which history admonished them were sure to follow an infringement of the right.

It may be assumed, I suppose, that the jury trial was an established right of British subjects long before the earliest settlement of this state. Mr. Finlason says,—"It is probable that it is the most ancient part of our constitution, and consequently the most deeply rooted in our earliest institutions."  Note to 3 Reeves's Hist. of English Law 302.  In the charter of the council of Plymouth (November 3, 1620), it was provided that " All persons who may go to inhabit in said colony, and their children, shall have all the liberties of free- denizens and natural subjects, as if born and residing in England."  In the grant by the council of Plymouth to Gorges and Mason, of what was called the province of Maine (August 10, 1622), a covenant was carefully inserted, as follows : " And the said Sr. Ferdinando Gorges and Capt. John Mason doe further covenant for them, their heyres and assigns, that they will establish such government in the said porcons of lands and islands granted unto them, and the same will from time to time continue, as shall be agreeable, as neere as may be, to the laws and customs of the realme of England."  In the grant of New Hampshire by the same council to Mason (November 7, 1629)—" The said John Mason doth further covenant for him, his heirs and assigns, that he will establish such government in the said portion of lands and islands granted unto him, and the same will from time to time continue, as shall be agreeable, as near as may be, to the laws and customs of the realm of England."  In the commission to John Cutts, first president (September 18, 1679), after prescribing with some minuteness of detail the duties

of the president and council as a "setled Court of record," we find this : "So always y$^t$ y$^e$ forms of proceeding in such cases, and y$^e$ judgment thereupon to be given, be as consonant and agreeable to y$^e$ Laws and Statutes of this Our Realm of Eng$^d$, as y$^e$ p$^r$ent state and condition of our subjects inhabiting within y$^e$ limits aforesaid, and y$^e$ circumstances of y$^e$ place will admit." Cranfield, by his commission, was empowered to "erect, constitute, and establish such and so many courts of judicature and public justice, within the said province and plantation within your government, as you and they shall think fit and necessary for the hearing and determining of all causes, as well criminal as civil, *according to law and equity.*" 1 N. H. Prov. Pap. 9, 14, 25, 376, 437. It was, perhaps, the Masonian litigation that suggested further guaranties with respect to the right of trial by jury. At all events, in the judiciary act of 1692 we find this section : " And Be it further Enacted by the Authority aforesaid, That no persons Right of property shall be by any of the aforesaid courts determined, Except where matters of fact are either acknowledged by the parties, or judgment be acknowledged, or passeth by the defendant's fault for want of plea or answer, unless the fault be found by the Verdict of Twelve men of the neighborhood, as it ought of Right to be by Law." This act, as was observed in *Copp* v. *Henniker,* 55 N. H. 186, was substantially reënacted by the judiciary act of 1699, which contained no repealing clause, and remained in force until the revolution, and was substantially reënacted in 1776, and again in 1785.

One of the "injuries and usurpations, having in direct object the establishment of an absolute tyranny over these States," which was charged upon George the Third by the Declaration of Independence, was,—" He has combined with others to subject us to a jurisdiction foreign to our Constitution, and unacknowledged by our laws ; giving his assent to their acts of pretended legislation :   *   *   *   For depriving us, in many cases, of the benefits of trial by jury."

It will hardly be contended that when the framers of the constitution spoke of cases in which it had been theretofore otherwise used and practised, they meant cases where the subject had theretofore been despoiled and deprived of the right by the usurpation and tyranny of the king ; nor can it with any greater reason be claimed that they meant cases where the right had been lost by the usurpation of the royal governor, the interference of the provincial legislature, or the ignorance, incapacity, or corruption of the courts. They clearly meant to except cases in which it had been theretofore *legally* otherwise used and practised, and not those in which it had been otherwise used and practised in plain violation of law, and in derogation and defiance of the right of the citizen, as established and secured to him by the British constitution, and plainly laid down and defined by the provincial act of 1692.

The irregularities and usurpations, which the industry of the defendant's counsel has discovered in the administration of the municipal law of the province, do not lead my mind to the conclusion that the right of trial by jury is not guaranteed, in any case, by the constitution, any

more than the usurpations and tyranny of the king, denounced in the Declaration of Independence, lead to the same conclusion. If a provincial legislature usurped judicial functions, there might be no immediate remedy at hand ; but such usurpation would not be a repeal of the act of 1692, and the people never showed any disposition to surrender the right secured to them by that act, as well as by the stronger guaranties of the common law, which was theirs both by inheritance and by charter.

This is enough to show, as I think, that the court cannot decide this question against the defendant upon the ground that the constitution does not really and absolutely secure the right of jury trial in any case.

The question then is, whether in matters of account—that is, cases which come within the terms of the auditor law of 1823—a jury trial was the legal use and practice before the constitution.

There are two things which probably will not be denied : first, that long before the adoption of the constitution the investigation and adjustment of accounts had come to be matter of well understood and admitted equity jurisdiction ; and, second, that until the case of *Marston* v. *Brackett*, 9 N. H. 336, decided in 1838, it had not been intimated in this state, or anywhere else, that there was a right of trial by jury in equity proceedings. I venture to say that if such a right ever existed in this state, it was after and not before the observation of Chief-Justice PARKER in that case. It is not necessary, in the view I take, to inquire whether that observation established such a singular and anomalous doctrine in this state or not. It is enough that up to that time all the books and cases, wherever the common law prevails, are the other way. It adds very little to the argument, one way or the other, so far as I can see, whether any provincial court ever in fact exercised chancery powers, making use of the forms of proceeding usually employed for that purpose in England, and latterly in this country. Nor does it appear to be of much consequence whether Judge BELL was right when he said, in *Wells* v. *Pierce*, 27 N. H. 512, that " Equity, as a great branch of the law of their native country, was brought over by the colonists, and has always existed as part of the common law in its broadest sense in New Hampshire ; " and that the act of 1692, establishing the governor and council a high court of chancery, was never repealed ; or whether Governor Bell was right, when, thirty-two years before, in his message to the legislature, he made the remark quoted in in *Copp* v. *Henniker*, p. 211, viz., " Our ancestors, who adopted in general the laws of that country from which they originated as the basis of their code, omitted to introduce into practice that part of the system which pertains to chancery jurisdiction." Suppose, at some period after the adoption of the constitution, and before the act of 1832 conferring general equity powers upon the supreme court, the legislature had given to the court a single isolated branch of equity jurisdiction and power,—as, for example, that of decreeing the specific performance of contracts, without creating it a court of chancery by name, and without providing that any of the forms of chancery pro-

ceedings should be observed : if such a thing were done, I do not see how it can be doubted that the legislature might make such provisions, with respect to the mode of settling the facts upon which the relief sought depended, as they might think proper ; and, if a jury trial were provided, that trial might be granted, subject to such limitations and qualifications as appeared to them expedient and just.

In the case supposed, what difference could it make whether the equity power to enforce the specific performance of a contract had ever been exercised by any tribunal, either in the province or the state, before or not ? If it was a power never used nor practised in the province before the constitution in any form, then to determine the true application of the terms "heretofore used and practised," as used in the bill of rights, we must go to the common law with respect to the new right and power thus conferred ; and, doing that, we find it not to be a case in which it had been used and practised anywhere before the constitution, to have a trial by jury as matter of legal right. Why does not this reasoning apply to the auditor law ? The investigation of accounts was a branch of equity jurisdiction in which a right of trial by jury did not exist. When the legislature made provision for a jury trial in such cases, why could they not fix and determine the character of such trial—upon what conditions and under what limitations it should be had, as well as in the other case supposed ?

It probably is not capable of demonstration that this view is correct ; but I think it is greatly strengthened by the long acquiescence in the auditor law. Without disparagement to any living member of the bar in this state, it may be said that the legal scrutiny directed upon the auditor law at its first appearance, and in its early operation, must have been equally acute and searching with that which met the referee law of 1874. The jealousy with which the right of trial by jury has been watched and guarded has not increased in this state any more than in other parts of the common law world for the past half century. Unless the provision in that law, making the auditor's report *prima facie* evidence to the jury, stood upon some ground that was familiar, and admitted to be sufficient by that generation of lawyers, it seems inconceivable that it should have been permitted to pass unchallenged.

The constitution of Vermont contains a provision, " That when any issue of fact, proper for the cognizance of a jury, is joined in a court of law, the parties have a right to trial by jury, which ought to be held sacred." Part 1, Art. 12. By an early statute of that state, minute and detailed provisions are made with reference to the action of account. Upon the entry of such action in court, if the defendant shall plead in defence any plea which, being true, he ought not to account, it may be tried by a jury ; and if the verdict be found against him, or if the defendant shall not appear, or, appearing, confess that he ought to account with the plaintiff, the court shall render judgment that he do account. When judgment to account shall be rendered, the court shall appoint one or more judicious and disinterested men to to hear, examine, and adjust the accounts between the parties. Then

it provides for notices, hearing, &c., the return of a report, and rendition of judgment thereon by the court, if no just cause be shown to the contrary; which judgment shall be final between the parties.    There is no trial by jury in such cases, except upon the question of whether the defendant is liable to account with the plaintiff; and I am not able to learn that the constitutionality of the act has ever been questioned. But when a reference law, with provisions very similar to those found in our act of 1874, was passed by the legislature of that state in 1856, its validity was immediately denied, and the court, without hesitation, declared it to be in conflict with that clause of the constitution which I have quoted.    *Plimpton* v. *Somerset*, 33 Vt. 283.    This would seem to show a state of things in Vermont very similar to that existing here— that is to say, either extraordinary obtuseness on the part of the early lawyers of that state, or extraordinary acuteness on the part of the later ones; or else that matters of account never came within the constitutional provision, either for the reason I have supposed, or for some other reason which was known to be sufficient by the early interpreters of the constitution.    It is in this view that I deem the acquiescence, for more than half a century, in the auditor law entitled to great weight in determining the question presented by this case.    It fortifies my opinion that it was not understood by the framers of the constitution, their contemporaries, or immediate successors, that there was ever an absolute right of trial by jury in matters of account; and that being so, when such a right was given upon the coming in of the report of an auditor, most clearly it would be within the power and discretion of the legislature to shape the trial according to their views of what the public good required; and so they might burden it with the condition that the report should be used as evidence in the trial before the jury.

Upon the whole, I am by no means satisfied beyond a reasonable doubt that there was in 1792 a legal right to trial by jury in that class of cases which come within the operation of the auditor law, and I therefore hold that the ruling of the court below, admitting the report in this case as evidence to the jury, in accordance with the provisions of that law, must be sustained.

As to whether that part of the law, empowering the court to send certain cases to an auditor, could be sustained, provided the part making the report evidence were in conflict with the constitution, need not be inquired, for two reasons : first, the question is not raised by the case ; second, the court are agreed that the whole law is to be sustained.

No question of waiver is before us, as I understand the case.    Doubtless the right to a jury trial, like many other constitutional privileges affecting private property and the rights of individuals, may be waived. I may say, however, that I, for one, should hesitate before holding that the citizen, merely by silently yielding a temporary and constrained obedience to an unconstitutional statute, thereby debars himself from calling in question the validity of the law for the vindication of his violated rights.    It perhaps would not be unreasonable to hold that a

party moving that his cause be sent to an auditor, thereby signifies his willingness to accept the qualified jury trial permitted by the statute after the coming in of a report. But as this question is not in the case, the subject need not be pursued.

SMITH, J. The framers of the constitution, in asserting in Art. XX of the Bill of Rights the right of trial by jury, " except in cases in which it has been heretofore otherwise used and practised," clearly recognized that there were one or more classes of cases in which trial by jury could not be demanded as matter of right. There is no doubt that at common law there were many cases in which a trial by jury could not be had. The law in relation to auditors undoubtedly, to some extent, grew out of actions of account, or took the place of suits in equity in relation to such matters. To what extent the practice obtained in this state of trying actions involving matters of account without a jury, it is not easy exactly to establish. But I am satisfied that the causes included within the provisions of the auditor law are also included within the exception in Art. XX of the Bill of Rights. It is difficult otherwise to understand how such a law could exist upon the statute-book of the state for more than half a century without its constitutionality being questioned. That it was not drawn in question until the controversy in regard to the act of 1874 authorizing compulsory references arose, affords very strong evidence of what has been the practical understanding of the profession as to the constitutional right of the legislature to enact such a law. If this be so, then the legislature, when it enacted the statute of 1823 in relation to auditors, might have authorized a judgment without the intervention of a jury, and, being under no constitutional compulsion to give a jury trial, when it gave it the gratuity could be coupled with such conditions as it saw fit to impose.

We held, in *Doyle* v. *Doyle*, 56 N. H. 567, that it is too late to question the constitutionality of this law, and the discussion and further examination in this case have only satisfied me of the correctness of that holding.

As we hold the law to be constitutional, there is no occasion to discuss the question of waiver.

*Exceptions overruled.*